IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 16, 2003 Session

## STATE OF TENNESSEE v. MUHAMMED NURIDDEN[1]

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 239726     Rebecca J. Stern, Judge**

_____

**No. E2003-00996-CCA-MR3-CD**
**April 20, 2004**
_____

The appellant, Muhammed Nuridden, was found guilty by a jury in the Hamilton County Criminal Court of possession of more than .5 grams of cocaine with the intent to sell or deliver. Additionally, the appellant pled guilty to driving on a revoked license and possession of marijuana. The appellant received a total effective sentence of nine years in the Tennessee Department of Correction. On appeal, the appellant raises numerous issues for our review, including evidentiary issues and the sufficiency of the evidence. Upon our review of the record and the parties' briefs, we reverse the appellant's conviction for possession of more than .5 grams of cocaine with the intent to sell or deliver and remand for new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed and Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Lloyd A. Levitt, Chattanooga, Tennessee, for the appellant, Muhammed Nuridden.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; William H. Cox, District Attorney General; and Barry A. Steelman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On March 13, 2002, the Hamilton County Grand Jury returned an indictment charging the appellant with possession of .5 grams or more of cocaine with the intent to sell or deliver, driving on

---

[1] The indictment also reflects the following aliases: "Mustafa J. Nuridden," "Mohomib Nardain," and "Eric Jason Spoon."

a revoked license, possession of marijuana, and assault. The charges arose following a stop of the appellant in the Emma Wheeler Homes in Chattanooga. Prior to trial, the appellant filed a motion to suppress the crack cocaine seized pursuant to a search of his person. The trial court conducted a hearing on the appellant's motion on July 22, 2002.

## A. Motion to Suppress

At the hearing on the motion, the State called Officer Adam Patterson of the Chattanooga Police Department as its first witness. Officer Patterson related that he encountered the appellant on October 8, 2001, during a traffic stop. After stopping the vehicle, Officer Patterson called his dispatcher to inquire about the status of the appellant's driver's license. The dispatcher informed him that the appellant's license had been revoked as a result of a conviction for driving under the influence. Accordingly, Officer Patterson arrested the appellant for driving on a revoked license.

Next, the State called Detective Ralph Kenneth Freeman with the Chattanooga Police Department. Detective Freeman testified that at the time of the hearing he was an investigator with the "major crimes" unit of the Chattanooga Police Department, but he had previous experience in working with narcotics investigations.

In February 2002, Detective Freeman was working a second job as a security officer for the Chattanooga Housing Authority. Specifically, Detective Freeman was assigned to patrol the Emma Wheeler Homes housing project. Detective Freeman had been informed by the housing authority to particularly enforce "noise violations and traffic issues." Detective Freeman patrolled in an unmarked Lumina with a blue light visible in the window, and he wore his police uniform.

At approximately 11:30 or 11:45 a.m. on February 4, 2002, Detective Freeman heard "a loud thump, boom, boom, loud thump. Some type of music." Detective Freeman realized that the noise was coming from a car stereo, and he pursued the vehicle from which the noise was emanating.

The vehicle soon parked in front of a residence in the Emma Wheeler Homes housing project and the appellant exited the vehicle. Detective Freeman stated that he did not know the appellant was driving the vehicle until he exited the car. However, he recognized the appellant immediately upon his exit from the vehicle. Detective Freeman explained that he had previously made a traffic stop of the appellant and was aware that he had been charged with "shooting into a home." Moreover, he was aware that the appellant had been "charged with narcotics in the past." Additionally, the appellant had been under investigation by the Chattanooga Police Department, and Detective Freeman had heard other officers say "daily" that the appellant was driving on a revoked license. Accordingly, Detective Freeman wanted to talk to the appellant about the noise and ask for the appellant's driver's license.

After exiting his vehicle, the appellant walked to a residence and knocked on the door. Detective Freeman knew that the residence belonged to a female who was not home at the time. The

-2-

door was answered by a man who identified himself as "Lawaun Jones."[2] Detective Freeman parked close to the appellant and got out of his vehicle. Jones drew the appellant's attention to the detective. Detective Freeman verbally instructed the appellant to approach and also motioned for him to do so. Detective Freeman testified that the appellant "looked at me and he just ignored me and got back into his vehicle."

As Detective Freeman approached the appellant's vehicle, the appellant began "reaching . . . somewhere inside the vehicle." Fearing that the appellant was reaching for a weapon, Detective Freeman "[g]ot him out of the vehicle. At that time I placed him – handcuffs on him and I patted him down." Detective Freeman arrested the appellant because of the noise violation and because the appellant could not produce a valid driver's license. Detective Freeman explained that he placed the appellant in handcuffs because he was being "so combative" and had a "propensity for violence." Detective Freeman stated that during a "pat-down" he felt "[w]hat I perceived to be a narcotic" in the right pocket of the appellant's pants. Detective Freeman described the object as "a little hard rock substance so, you know, I figured it was cocaine." The appellant's hands were restrained behind his back. Nevertheless, he attempted to reach around toward his right pants pocket. Detective Freeman testified, "At that point I reached into his pocket to pull out what I initially felt in his pocket and I pulled out crack cocaine." Additionally, Detective Freeman looked into the appellant's vehicle and noticed in plain view what appeared to be marijuana in the floorboard in front of the passenger seat of the appellant's vehicle.

Detective Freeman sent the substance he withdrew from the appellant's pocket to the Tennessee Bureau of Investigation (TBI) crime laboratory. The report from the laboratory revealed that the substance was 3.6 grams of cocaine. Detective Freeman stated that he could not remember how many "rocks" of crack cocaine the appellant possessed. However, upon being pressed by defense counsel, the detective estimated that there could have been twenty-five to thirty-five "rocks." Detective Freeman opined that the crack cocaine may have had a street value of $2500.

The trial court overruled the appellant's motion to suppress. Specifically, the trial court found that "the articulable suspicion was when he knew – that he had reasonable and articulable suspicion to detain him because of his information concerning [the] possibility that he was driving on revoked because he recognized him and it was [the appellant] at this point and everything else follows." Subsequently, a trial was held on this matter.

## B. Trial

Prior to trial, the appellant pled guilty to driving on a revoked license and possession of marijuana. Additionally, the appellant stipulated that he possessed the crack cocaine; however, the

---

[2] Detective Freeman stated that he later learned that the man had given a false name.

appellant maintained that he did not possess the crack cocaine with the intent to sell or deliver.[3] The appellant made no concessions regarding the assault charge.[4]

Detective Freeman testified at the appellant's trial. His testimony largely mirrored the testimony he gave at the suppression hearing. He stated that he was working for the housing authority on February 4, 2002, and was on patrol when he heard the appellant's loud stereo. He observed the appellant leave his car with the motor running and approach the door of the residence. The appellant also left the car stereo blasting. At the direction of the man who opened the door, the appellant looked at Detective Freeman. The detective instructed the appellant to approach and made a "come here" gesture. The appellant ignored Detective Freeman and got back into his car. The appellant began reaching in the vehicle, and Detective Freeman, for his safety, removed the appellant from the vehicle and conducted a pat-down search of the appellant. The appellant did not display any identification when Detective Freeman requested it. Detective Freeman also saw marijuana in the floorboard of the appellant's vehicle when the appellant exited the vehicle.

During the pat-down, Detective Freeman felt what he believed to be drugs in the right pocket of the appellant's pants. The appellant, whose hands were cuffed behind his back, began reaching toward that pocket. Thereupon, Detective Freeman removed the item from the pocket and discovered that it was a "cookie" of crack cocaine wrapped in a plastic bag. Detective Freeman discovered no paraphernalia for the use of crack cocaine on the appellant's person or in his vehicle. Additionally, the appellant was "pretty coherent" and had no signs of being a frequent user of crack cocaine.

A further search of the appellant revealed $526 in cash in the following denominations: one one hundred dollar bill, seventeen twenty dollar bills, eight ten dollar bills, one five dollar bill, and one one dollar bill. Detective Freeman testified that he had experience with the drug trade and was aware that crack cocaine was most commonly sold in ten or twenty dollar denominations. At the time of his arrest, the appellant told Detective Freeman that he was unemployed.

Detective Freeman acknowledged that at the suppression hearing he had estimated that the appellant had twenty-five or thirty-five rocks of crack cocaine in his possession. However, he explained that the "cookie" discovered on the appellant could be broken down into twenty-five or thirty-five rocks. Detective Freeman admitted that he did not search the residence the appellant was visiting for drug paraphernalia. Detective Freeman maintained that he had "never come across a junkie with a chunk like that."

Adam Gray, a forensic chemist with the TBI crime laboratory, testified that he examined the "cookie" found in the appellant's possession and determined that it was 3.6 grams of cocaine base. Gray maintained that the average crack "rock" sent to the laboratory weighed .1 or .2 grams.

---

[3] Immediately prior to trial, the appellant informed the trial court that he was "pleading guilty to simple possession." However, the record clearly reflects that the appellant was stipulating his possession of the crack cocaine, not entering a guilty plea. See Tenn. R. Crim. P. 11.

[4] The trial court granted the appellant a judgment of acquittal on the assault charge.

Over the appellant's objection, the trial court allowed Officer Johnny Martin with the Chattanooga Police Department to testify that he had arrested the appellant on May 17, 2000. At the time of the arrest, the appellant possessed a large amount of crack cocaine. Officer Martin stated, "It was packaged in, you know, sandwich bag that you cut off into many different size rocks, you know, you can sell them for tens or twenties, depending on what size the rock was and they were cut up in different ones like that." Officer Martin also discovered that the appellant possessed $480 in cash, consisting primarily of ten and twenty dollar bills. The appellant admitted to Officer Martin that he was unemployed at the time of his arrest. At the conclusion of Officer Martin's testimony, the trial court instructed the jury that they were not to consider the testimony as propensity evidence, but they could consider the testimony as proof of the appellant's intent on February 24, 2002.

Brent Trotter, a forensic chemist with the TBI crime laboratory, testified that he examined the substance seized by Officer Martin on May 17, 2000. Trotter stated that the substance was 11.4 grams of cocaine.

The appellant also objected to the testimony of Officer Jerry Ryke Merrill regarding another unrelated charge. The trial court overruled the objection and allowed Officer Merrill to testify. Officer Merrill stated that on August 4, 2001, he conducted a traffic stop of the appellant. A search of the appellant's vehicle revealed three "fairly large rocks" of a substance Officer Merrill believed to be crack cocaine. Officer Merrill never submitted the substance to a laboratory for testing. During the stop of the appellant, Officer Merrill also discovered that the appellant possessed $399.86. Officer Merrill ultimately charged the appellant with simple possession. At the conclusion of Officer Merrill's testimony, the trial court again gave the limiting instruction that the testimony was to be considered only for proof of the appellant's intent.

The State also presented testimony from Robert C. Chester, Jr., an agent with the Drug Enforcement Agency (DEA). Agent Chester testified that he had twenty years experience with the DEA and, in connection with his duties as a DEA agent, he had bought and sold cocaine. Agent Chester maintained, "Crack cocaine is broken up in rocks and distributed in rock quantity or depending on if they want to buy sixteenths, or they want to buy an eight ball or a quarter ounce or whatever." Agent Chester explained that in street terms a "twenty" is a twenty dollar piece of crack cocaine. By the same token, a "dime" is a ten dollar piece of crack cocaine. Agent Chester also explained that crack cocaine is usually sold in ten and twenty dollar increments. Agent Chester further stated that "ten rocks is basically equaling one gram of cocaine," meaning that one rock is typically .1 gram. When asked about the cash found in the appellant's possession on February 4, 2002, Agent Chester theorized, "Well, the denominations are consistent with, you know, lower level drug sales. Twenties, the most were twenties and tens."

Specifically referring to the market for drugs in Chattanooga, Agent Chester opined that 3.6 grams of crack cocaine could be broken into thirty-six to forty "rocks." The rocks could then be sold for ten or twenty dollars each, making the street value of 3.6 grams of crack cocaine worth between $360 and $720. Agent Chester stated that people make smaller "rocks" to smoke by chipping away at bigger "rocks."

Agent Chester testified that he had witnessed people smoking as little as .036 of a "rock" or as much as a gram. Accordingly, it was possible for 3.6 grams to be used in one day, depending upon the number of people using and the "craving" or "appetite" of the people involved. Agent Chester also stated that while it would be possible for one person to smoke ten "rocks" in one day, such person would be an addict, not a casual user. He maintained that crack cocaine was "very addictive."

David Vance was the first witness to testify on behalf of the appellant. Vance stated that he worked in construction and obtained jobs from subcontractors. Vance sometimes employed five or six people at a time. The appellant worked for him from November 2001 to February 2002, earning nine dollars an hour as a general laborer. Vance did not keep records of what he paid his workers because "I just pay off cash because that's how I am paid for the jobs that I do." He further stated that he paid his workers at the completion of a job or every Friday. Vance asserted that if he had paid the appellant over $200, "he might had a hundred, twenties and tens like that, broken down." Vance opined that the appellant worked twenty-five or thirty hours a week, depending on the work available and the weather.

Vance testified that he never saw the appellant use cocaine on the job or appear to be under the influence of any intoxicating substance. Moreover, Vance never saw the appellant in possession of crack cocaine. Vance stated that to his knowledge the appellant did not have an operable vehicle; instead, Vance would pick up the appellant and take him to work. However, Vance was aware that the appellant's father gave the appellant a yellow 1969 Impala which the appellant sold around the first of 2002.

Jeremy Houston was the final witness to testify on behalf of the appellant.[5] Houston admitted that he was convicted of robbery in 2001. Houston testified that the appellant called him at 7:30 or 8:00 a.m. on February 4, 2002, then picked him up at approximately 9:00 a.m. Houston and the appellant began smoking marijuana laced with crack cocaine. The two men decided to visit someone living in Emma Wheeler Homes. Houston stated, "We had smoked two blunts, while we was riding . . . . We was fixing to smoke another one, when we had got to the house." Houston explained that he and the appellant were going to the residence to see "Tommy" and "get high some more." Houston recalled that "we was playing the music loud." When they arrived at the residence, they left the engine running while they checked to see if "Tommy" was home.

Houston stated that once they were at "Tommy's" residence, the appellant "[t]ook blunts out of his pocket and went back outside to cut the car off or whatever and then we heard like a car slam on its brakes. I looked out the window and I saw the Officer right there . . . with his gun on him." Houston thought that Detective Freeman was "fixing to kill" the appellant "until I saw his uniform because he was in an unmarked car or whatever and the way his tone of voice and the type of stuff he was saying, I thought it was like something was going on like they was into it. I looked, I was like, man, that's the police, you know, it was just crazy."

_____

[5] Houston also used the name "Jeremy Little."

Houston testified that he had bought and sold cocaine and was aware of its street value. He stated that while one gram of crack cocaine was worth $40 or $50, the appellant had an "eight ball," which could be purchased for $120 "at the most." Houston maintained, "If you was going to use it, you wouldn't break it up into rocks, you know. But you get four or five rocks per gram." Accordingly, 3.6 grams of crack cocaine would yield twelve to fifteen "rocks."

Houston testified that at the beginning of January 2002, the appellant sold a yellow 1970 Impala that his father had given him. Houston was with the appellant when he sold the vehicle, and he knew that the appellant was paid $1200 in cash from someone named "Stephen."

Based upon the foregoing proof, the jury convicted the appellant of possession of .5 grams or more of cocaine with the intent to sell or deliver. On appeal, the appellant raised the following issues for our review: whether the trial court erred in overruling the appellant's motion to suppress; whether the trial court erred in admitting the testimony of Officers Martin and Merrill regarding prior bad acts of the appellant; whether the trial court erred in overruling the appellant's objection to a statement made in the State's closing argument; and whether the trial court erred in denying the appellant's motion for a judgment of acquittal.

## II. Analysis

### A. Motion to Suppress[6]

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001), cert. denied, 534 U.S. 948, 122 S. Ct. 341 (2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable, thus violative of

---

[6] On appeal, the State maintains that the appellant "entered a guilty plea to the charge of possession of cocaine" and "failed to reserve a certified question of law" regarding his suppression issue. Therefore, the State argues, the appellant "has waived this issue." However, as we earlier noted, the appellant entered into a stipulation of fact, not a guilty plea. Accordingly, the appellant was not required to certify a question of law in accordance with Rule 37 of the Tennessee Rules of Criminal Procedure in order to seek appellate review of this issue.

constitutional protections.  See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000).  However, a warrantless search and seizure may be reasonable if it falls within the limited exceptions to the warrant requirement.  See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).  One such exception is an investigatory stop, and subsequent frisk, as authorized by Terry v. Ohio, 392 U.S.1, 27, 88 S. Ct. 1868, 1880 (1968).  See Yeargan, 958 S.W.2d at 630.

"It is well-established that a police officer may make an investigatory stop when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997) (citing Terry, 392 U.S. at 21, 88 S. Ct. at 1880).  Additionally, Terry authorizes a protective frisk if "the police officer has a reasonable suspicion based on specific and articulable facts that the suspect is armed." Id.  The facts supporting an officer's reasonable suspicion may be derived from information from other law enforcement personnel or agencies, information from citizens, known patterns of criminal offenders, or deductions based upon an officer's experience.  Id.; see also State v. Winn, 974 S.W.2d 700, 703 (Tenn. Crim. App. 1998).

A protective frisk is authorized upon a law enforcement officer's reasonable belief that the suspect may be armed with a dangerous weapon or is "otherwise . . . dangerous when the citizen is detained." State v. Curtis, 964 S.W.2d 604, 612-13 (Tenn. Crim. App. 1997).  Accordingly, courts have deemed frisks reasonable when the suspected crime typically involves the use of a weapon; e.g. "a robbery, burglary, rape, assault with a weapon, homicide, and large scale narcotics trafficking." Winn, 974 S.W.2d at 703.  However, even if the suspected crime does not typically involve the use of a weapon, the protective frisk may still be justified if the following "other circumstances" are present:

> "[A] characteristic bulge in the suspect's clothing; observation of an object in the pocket which might be a weapon; an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed; an otherwise inexplicable failure to remove a hand from a pocket; backing away by the suspect under circumstances suggesting he was moving back to give himself time and space to draw a weapon; awareness that the suspect had previously been engaged in serious criminal conduct; awareness that the suspect had previously been armed; [and] discovery of a weapon in the suspect's possession."

Id. at 704 (quoting Wayne R. LaFave, Search and Seizure, § 9.5(a) (3rd ed. 1996 and Supp. 1997)).

In the instant case, Detective Freeman testified at both the suppression hearing and at trial that the stereo of the appellant's vehicle was extremely loud.  Therefore, he pursued the vehicle in order to ask the driver to turn down the music.  See State v. Brent Allen Blye, No. 03C01-9508-CC-00245, 1996 WL 414412, at *2 (Tenn. Crim. App. at Knoxville, July 23, 1996).  Detective Freeman recognized the appellant when he exited the vehicle, and he suspected that the appellant was driving

on a revoked license. Detective Freeman knew from "intelligence at the police department" that the appellant did not have a valid driver's license. Specifically, Detective Freeman testified, "I had discussed numerous times with other officers about him not having a valid license." The detective stated that these discussions occurred "possibly daily." Therefore, Detective Freeman had reasonable suspicion based upon specific and articulable facts that the appellant was committing a crime. Accordingly, an investigatory stop was warranted. Next, we turn to whether Detective Freeman was justified in performing a protective frisk.

Detective Freeman testified that initially he instructed the appellant to approach him. The appellant ignored Detective Freeman and got into his car. When Detective Freeman approached the appellant's vehicle, he noticed the appellant "reaching" around inside the vehicle. Detective Freeman testified that he knew "about a prior episode of violence in which [the appellant] was charged with shooting into a home." Based upon that information, Detective Freeman was concerned that the appellant "possibly carried a handgun." Therefore, we conclude that Detective Freeman was justified in performing a protective frisk of the appellant.

Although the frisk of the appellant did not reveal the presence of weapons, Detective Freeman did discover a "cookie" of crack cocaine in the right pocket of the appellant's pants. In Minnesota v. Dickerson, 508 U.S. 366, 113 S. Ct. 2130 (1993), the United States Supreme Court held that "if an officer detects contraband through the sense of touch during a valid Terry frisk, the officer may seize the contraband." Bridges, 963 S.W.2d at 493. The Dickerson court explained:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context.

Dickerson, 508 U.S. at 375-76, 113 S. Ct. at 2137 (footnote omitted). Accordingly, an officer may appropriately seize contraband under the "plain feel" doctrine if

> 1) a prior valid reason exists for the intrusion, i.e., the patdown must be permissible under Terry; 2) the contraband is detected while the Terry search for weapons legitimately is still in progress; and, 3) the incriminating nature of the object perceived by the officer's sense of touch is immediately apparent giving the officer probable cause to believe the object is contraband prior to its seizure.

Bridges, 963 S.W.2d at 494. Generally, "[p]robable cause exists when the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that the item may be contraband." Id. In determining probable cause, courts must consider the totality of the circumstances. See State v. Cothran, 115 S.W.3d 513, 524 (Tenn. Crim. App. 2003).

During the frisk, Detective Freeman "felt . . . a little hard rock substance so, you know, I figured it was cocaine." The detective explained that in his experience as a narcotics officer he had located cocaine on suspects "[p]robably hundreds of times" and was familiar with the feel of crack cocaine. Additionally, Detective Freeman stated that at the time of the stop he was aware that the appellant had a history of dealing in narcotics. Furthermore, Detective Freeman saw the marijuana in the appellant's car prior to the search. After the frisk, the appellant, whose hands were cuffed behind his back, repeatedly tried to reach into the same pocket in which the crack cocaine was found. We conclude that based upon the totality of the circumstances, Detective Freeman had probable cause to believe the object was contraband. See Cothran, 115 S.W.3d 524. Accordingly, the trial court correctly denied the appellant's motion to suppress.

## B. Rule 404(b)

The appellant also complained that the trial court erred in allowing the State to present testimony regarding his two prior possessions of crack cocaine. Tenn. R. Evid. 404 provides:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). Moreover, in order to permit the admission of the evidence, the court must find by clear and convincing evidence that the appellant committed the prior crime.[7] See State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996); Parton, 694 S.W.2d at 303. A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be

---

[7] Effective July 1, 2003, Rule 404(b) was amended to also require the trial court to find the existence of the prior act by clear and convincing evidence.

afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character. If the evidence is relevant, then, upon request, the court will proceed to a Rule 404(b) hearing. See State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. at Nashville, Jan. 22, 2003) (stating that the admission of prior act testimony must also meet the test for relevancy contained in Tennessee Rule of Evidence 401), perm. to appeal denied, (Tenn. 2003).

In the instant case, the State argued that it wanted to present the testimony of Officer Martin as a "prior bad act[] . . . related to [the appellant's] intent. If he's unemployed, in possession of a large amount of cash, it's a prior bad act. . . . We offer it to show that his intent at the time was to sell." The appellant objected to the testimony, arguing that the testimony described a prior bad act and was prejudicial and irrelevant.

During a jury-out hearing, Officer Martin testified that on May 17, 2000, he arrested the appellant for possession of 11.4 grams of crack cocaine. The appellant also had $480 in his possession even though he told the officer that he was unemployed. Officer Martin related that the possession charges resulting from this arrest were dismissed. At the conclusion of the officer's jury-out testimony, the trial court ruled, "I am going to allow Mr. Martin to testify for the limited purpose of intent."

Additionally, the appellant objected to the testimony of Officer Merrill, contending that his testimony was irrelevant and did not qualify for admission under Rule 404(b). During a jury-out hearing, Officer Merrill testified that on August 4, 2001, he stopped the appellant for a traffic violation and discovered in the appellant's possession a pill bottle containing three "pretty good size rocks" of crack cocaine. The appellant told Officer Merrill that he was unemployed at the time of the stop; nevertheless, Officer Merrill found $399.86 in the appellant's possession. The State again argued that the officer's testimony "goes to intent, you know, what his intention on prior occasions of possessing a large amount of cash money when he is unemployed and cocaine." The trial court allowed the testimony to be admitted because "it goes to other issues other than propensity."

Initially, we note that in the instant case, the trial court failed to specifically find that the State proved by clear and convincing evidence that the appellant committed the prior acts. "The record must show affirmative compliance with [this] requirement[] as a mandatory pre-requisite for review by the appellate courts." Parton, 694 S.W.2d at 303. Nevertheless, we will address the substance of the appellant's complaint.

This court has previously admitted evidence of prior drug sales to show the accused's intent to sell on the charged occasion. See State v. Little, 854 S.W.2d 643, 649 (Tenn. Crim. App. 1992); State v. Samuel L. Giddens, No. M2002-00163-CCA-R3-CD, 2003 WL 1787289, at *3 (Tenn. Crim. App. at Nashville, Apr. 4, 2003). However, in the instant case, there was no evidence of prior sales, only of prior possessions. As the appellant argued, "the introduction of the two prior drug possessions required the jury to essentially try three cases." The jury needed to determine the appellant's intent on the prior occasions in order to make the evidence relevant to his intent on the instant occasion. Cf. State v. Wendell Ray Williams, No. M2001-02296-CCA-R3-CD, 2003 WL 1787283, at *5 (Tenn. Crim. App. at Nashville, Apr. 4, 2003); State v. Keith A. Otey, No. M2000-01809-CCA-R3-CD, 2002 WL 560960, at *6 (Tenn. Crim. App. at Nashville, Apr. 16, 2002). "Evidence of other offenses is not admissible for the purpose of showing propensity or disposition on the part of the defendant to commit the crime for which he is on trial." Parton, 694 S.W.2d at 303. Accordingly, we conclude that the trial court abused its discretion by admitting the testimony of Officers Martin and Merrill.

Furthermore, we conclude that the admission of the officers' testimony regarding prior acts was not harmless error. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). During deliberations, the jury submitted a note to the trial court which stated, "Need clarification on verdict number one. Guilty possess cocaine [greater than] .5 g[rams] for resale or deliver. Is this specific to arrest date or is it intent at any time to resale or deliver." Obviously, the jury was befuddled as to how the prior acts testimony should be considered. Because the prior acts testimony was erroneously admitted, and because the admission was not harmless, we conclude that the appellant's conviction for possession of cocaine with the intent to sell or deliver must be reversed.

C. Sufficiency of the Evidence

Although we have reversed the appellant's conviction, because of the possibility of further appellate review we will address the appellant's complaint that the trial court erred in failing to grant him a judgment of acquittal on the charge of possession of more than .5 grams of cocaine with the intent to sell or deliver. Initially, we note that this court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Moreover, "[a] motion for a judgment of acquittal made at the conclusion of the proof by the state is waived when the defendant elects to present evidence on his own behalf." State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); see also Tenn. R. Crim. P. 29(a). Accordingly, we will address the appellant's complaint as a challenge to the sufficiency of the evidence.

When an accused challenges the sufficiency of the evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000).

Moreover, we note that a guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Furthermore, while a guilty verdict may result from purely circumstantial evidence, in order to sustain the conviction the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the [appellant], and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

In order to sustain the appellant's conviction, the State was required to prove that he knowingly possessed a controlled substance, namely more than .5 grams of cocaine, with the intent to sell or deliver. See Tenn. Code Ann. § 39-14-417(a)(4) (1997). The appellant did not contest that he possessed the cocaine; instead, he contended that the State failed to prove his intent to sell or deliver. In connection with this issue, we note that Tennessee Code Annotated section 39-17-419 (1997) provides that "[i]t may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing."

In the instant case, the appellant possessed 3.6 grams of cocaine. Agent Chester testified that it was possible for a person to consume 3.6 grams of cocaine, but he maintained that such person would be an addict. Agent Chester also stated that the appellant's possession of a large amount of money, particularly large numbers of ten and twenty dollar bills, was consistent with the cash typically carried by those who sell drugs. He explained that crack cocaine is usually sold in increments of ten or twenty dollars, and stated that one rock is generally .1 gram. Detective Freeman testified that "when you buy [crack cocaine], it's a breakdown process. Normally it comes in what you call a cookie form." The detective explained that bits of the "cookie" would be broken off and sold. Detective Freeman asserted, "I have never come across a junkie with a chunk like that." He also stated that the appellant did not appear to be under the influence of any type of intoxicating substance. Further, Detective Freeman stated that the appellant did not possess any paraphernalia for the consumption of crack cocaine at the time of his arrest. We conclude that the foregoing evidence, while not overwhelming, would have been sufficient to sustain the appellant's conviction for possession of more than .5 grams of cocaine with intent to sell or deliver.

## D. Waiver

The appellant maintains that "[t]he prosecution failed to establish a proper chain of custody as to the crack cocaine seized from the appellant on February 4, 2002." The appellant also contends that, "The court erred in overruling the appellant's objection to the prosecution's closing argument when the district attorney [referred to crack cocaine as poison]." On appeal, the appellant made no arguments in relation to these issues, nor did he provide any citations to the record. "The brief of the appellant shall contain . . . [a]n argument, which may be preceded by a summary of argument, setting

forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on." Tenn. R. App. P. 27(a)(7). Accordingly, we consider these issues to have been waived. <u>See</u> Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

### III.  Conclusion

We reverse the appellant's conviction for possession of cocaine with the intent to sell or deliver and remand for new trial.

_____
NORMA McGEE OGLE, JUDGE